## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-23588

CIV - HUCK

FILED by ___ D.C.

OCT 0 2 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA,

    Plaintiff,

v.

SILA LUIS, ELSA RUIZ, and
MYRIAM ACEVEDO,

    Defendants.

_____/

**FILED UNDER SEAL**

MAGISTRATE JUDGE
BANDSTRA

### UNITED STATES' *EX PARTE* COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION

Plaintiff, the United States of America, by and through the undersigned attorneys, hereby alleges as follows:

### JURISDICTION AND VENUE

1.    The United States brings this action for a temporary restraining order, preliminary and permanent injunction, and other equitable relief pursuant to 18 U.S.C. § 1345.

2.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1345, and 28 U.S.C. §§ 1331 and 1345.

3.    This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because Defendants reside in this District or transact business in this District and Defendants' actions that gave rise to this case all occurred in this District.

### PARTIES

4.    Plaintiff is the United States of America.  At all times material to this action, the Department of Health and Human Services ("HHS") was an agency and instrumentality of the

United States, and the Centers for Medicare and Medicaid Services ("CMS") was the component agency of HHS that administers and supervises the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act ("Act"), 42 U.S.C. §§ 1395 *et seq.* ("Medicare Program").

5.      Defendant Sila Luis, a resident of Miami-Dade County, Florida, was president of LTC.  Sila Luis was also an owner and operator of LTC and Professional Home Care.

6.      Defendant Elsa Ruiz, a resident of Miami-Dade County, Florida, was an office administrator at LTC and an owner of Professional Home Care.

7.      Defendant Myriam Acevedo, a resident of Miami-Dade County, Florida, was an office administrator at LTC.

8.      LTC was a Florida corporation that did business in Miami-Dade County, Florida, as an HHA that purported to provide home health care and physical therapy services to eligible Medicare beneficiaries.

9.      As of 2003, Luis was listed as the president, administrator, owner, registered agent, director, officer and managing employee in LTC's Medicare Application and Articles of Incorporation.  In April 2006, LTC obtained Medicare provider number 10-8042, authorizing LTC to submit claims to Medicare for home health-related benefits and services.  Luis and Acevedo had signatory authority on the LTC corporate bank accounts.

10.      Professional Home Care was a Florida corporation that did business in Miami-Dade County, Florida, as an HHA that purported to provide home health care and physical therapy services to eligible Medicare beneficiaries.

11.      In October 2007, Professional Home Care obtained Medicare provider number 10-8475, authorizing Professional Home Care to submit claims to Medicare for home health-

related benefits and services.  As of September 2008, Ruiz has been listed as the administrator, director, owner, and vice president on the Medicare application and Articles of Incorporation for Professional Home Care.  Ruiz had signatory authority on Professional Home Care's bank accounts.

## THE MEDICARE PROGRAM

12.    The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are over the age of sixty-five or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.   Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

13.    Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

### Medicare Coverage of Home Health Services

14.    At all times relevant to this investigation, "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA") to beneficiaries who required home health services because of an illness or disability that caused them to be homebound.  Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

15.    Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was

3

required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services.

16.     The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits.  A patient qualified for home health benefits only if:

a.     the patient was confined to the home, also referred to as homebound;

b.     the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

c.     the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

17.     HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care."  The base payment was adjusted based on the health condition and care needs of the beneficiary.  This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition.   If a

4

beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

18.    CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims. As administrator, Palmetto was to receive, adjudicate, and pay claims submitted by HHA providers under the Part A program for home health claims.

19.    In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60 day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" are additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

20.    Medicare regulations allowed certified home health agencies to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified home health agency. That certified home health agency would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional

supervision over arranged-for services required the same quality controls and supervision of its own employees.

21.     For insulin-dependant diabetic beneficiaries, Medicare paid for insulin injections by an HHA agency when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary. Additionally, for beneficiaries for whom occupational or physical therapy was medically necessary, Medicare paid for such therapy provided by an HHA.  The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

22.     While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries that had the most extensive care needs, which may result in an Outlier Payment to the HHA.  These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

## Record Keeping Requirements

23.     Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the

HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

24.     Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS.

25.     Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary.  The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition.  The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury.  These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."   Medicare regulations require that home health agencies maintain medical records for at least seven years.

7

## DEFENDANTS' FRAUDULENT SCHEME

26.     From January 2006 through July 2009, LTC billed the Medicare program approximately $63 million for home health services for approximately 1495 beneficiaries, and it was paid more than $38 million. Of this $63 million, approximately $56 million represented billings to Medicare for diabetic skilled nursing care and/or physical therapy.

27.     From November 2007 through June 2012, Professional Home Care billed the Medicare program approximately $11 million for home health services for approximately 408 beneficiaries, and it was paid more than $7 million. Of this $11 million, approximately $10.5 million represented billings to Medicare for diabetic skilled nursing care and/or physical therapy.

28.     According to the Cooperating Witnesses, LTC and Professional Home Care paid kickbacks and bribes to nurses and patient recruiters so that they would place patients with LTC and Professional Home Care. LTC and Professional Home Care would then fraudulently bill Medicare for home health services that were not medically necessary and/or were not provided. Cooperating Witnesses have explained that LTC and Professional Home Care billed primarily for diabetic skilled nursing care and/or physical therapy, because of the high reimbursements they could obtain for these services.

29.     Patient recruiters would, in turn, pay Medicare beneficiaries kickbacks for agreeing to be placed at LTC and Professional Home Care. According to the Cooperating Witnesses, recruited beneficiaries accepted these kickbacks in return for allowing LTC and Professional Home Care to fraudulently bill the Medicare program for home health services that were not medically necessary and/or not provided.

30.     Several Cooperating Witnesses have stated that it was common knowledge that Luis owned and operated both LTC and Professional Home Care, and the patients were often

8

interchanged between both companies.  Luis and Ruiz were observed by various Cooperating Witnesses giving instructions to employees at LTC and Professional Home Care.

31.     According to various Cooperating Witnesses, employees at LTC and Professional Home Care caused patient files to be falsified in order to make it appear that Medicare beneficiaries qualified for and received home health services that in reality were not medically necessary and/or not provided.

32.     Virtually all of LTC's and Professional Home Care's billings to Medicare during the relevant time periods were fraudulent, in that they were tainted by unlawful kickbacks, not medically necessary, and/or not provided.

### Cooperating Witnesses

33.     Cooperating witnesses will provide the following information regarding LTC and Professional Home Care, Luis, Ruiz, and Acevdo, including the following individuals (the "Cooperating Witnesses"):

    a.     CW1 worked as a nurse for LTC and Professional Home Care from in or about 2007 through in or about 2009;

    b.     CW2 worked as a nurse and patient recruiter for LTC and Professional Home Care from in or about 2006 through in or about 2009;

    c.     CW3 worked as a nurse for LTC and as a nurse and patient recruiter for Professional Home Care from in or about 2006 through in or about 2009;

    d.     CW4 worked as a patient recruiter for LTC and Professional Home Care;

    e.     CW5 was the owner and operator of a medical clinic that purported to provide prescriptions and POCs for home health care services to Medicare beneficiaries.

f.      CW6 worked at LTC as a nurse from approximately 2009 through 2010, and as a patient recruiter for Professional Home Care;

g.      CW7 worked as a patient recruiter for LTC and Professional Home Care;

h.      CW8 worked as a patient recruiter for Professional Home Care.

## Details of the Fraudulent Scheme at LTC and Professional Home Care

### CW1 - Nurse

34.     CW1 worked as a nurse for LTC and Professional Home Care from in or about 2007 through in or about 2009.

35.     CW1 explained to law enforcement that he/she was hired to provide skilled nursing services. But, soon after starting work, CW1 learned that the patients at LTC and Professional Home Care were being paid and did not qualify for the home health services being billed to the Medicare program.  CW1 stated that LTC and Professional Home Care sought out purportedly diabetic beneficiaries because of the ability to fraudulently bill the Medicare program for skilled nursing visits two or three times per day per beneficiary, which in some cases resulted in fraudulent Medicare billings and payments exceeding $14,000 per 60-day period for each beneficiary.

36.     CW1 stated that his/her nursing notes indicated that he/she visited the patients two or three times a day, but, in reality, CW1 almost never visited the patients or provided services. CW1 would have the patients sign visit logs for visits that were never provided.

### CW2 – Patient Recruiter/Nurse

37.     CW2 worked as a nurse and patient recruiter for LTC and Professional Home Care from in or about 2006 through in or about 2009.

38.    CW2 explained to law enforcement that he/she was hired to provide skilled nursing services. But, soon after starting work, CW2 learned that the patients at LTC and Professional Home Care were being paid and did not qualify for the home health services being billed to the Medicare program.  CW2 stated that LTC and Professional Home Care sought out purportedly diabetic beneficiaries because of the ability to fraudulently bill the Medicare program for skilled nursing visits two or three times per day per beneficiary, which in some cases resulted in fraudulent Medicare billings and payments exceeding $14,000 per 60-day period for each beneficiary.

39.    CW2 stated that his/her nursing notes indicated that he/she visited the patients two or three times a day, but, in reality, he/she almost never visited the patients or provided services. CW2 would have the patients sign visit logs for visits that were never provided.

40.    CW2 stated he/she worked with an employee from LTC's quality control department to prepare the notes.  CW2 explained that he/she paid this employee $2 per patient note which the LTC employee completed on CW2's behalf.  CW2 would provide the LTC employee with weekly blood sugar logs and the LTC employee would complete the notes and add symptoms.  CW2 stated that the LTC employee falsified these nursing notes to match the symptoms on the patient's POCs.  CW2 stated that this was done by the LTC employee so that the services appeared legitimate, even though the symptoms did not exist.  CW2 explained that he/she had the notes completed in the same manner at Professional Home Care.

41.    CW2 explained that eventually he/she began recruiting patients for LTC and Professional Home Care.  CW2 was paid a kickback of approximately $1300 per patient per month for each patient prescribed skilled nursing visits.  CW2 was paid a kickback of approximately $600 per cycle for each patient prescribed physical therapy.  CW2 was paid

11

kickbacks for each patient he/she recruited for LTC by Acevedo and for Professional Home Care by Ruiz.

### CW3 – Patient Recruiter/Nurse

42.    CW3 worked as a nurse and patient recruiter for LTC and Professional Home Care from in or about 2006 through in or about 2009.

43.    CW3 explained to law enforcement that he/she was hired to provide skilled nursing services. But, soon after starting work, CW3 learned that the patients at LTC and Professional Home Care were being paid and did not qualify for the home health services being billed to the Medicare program. CW3 stated that LTC and Professional Home Care sought out purportedly diabetic beneficiaries because of the ability to fraudulently bill the Medicare program for skilled nursing visits two or three times per day per beneficiary, which in some cases resulted in fraudulent Medicare billings and payments exceeding $14,000 per 60-day period for each beneficiary.

44.    CW3 stated that his/her nursing notes indicated that he/she visited the patients two or three times a day, but, in reality, he/she almost never visited the patients or provided services. CW31 would have the patients sign visit logs for visits that were never provided.

45.    CW3 also worked as the Director of Nursing ("DON") at Professional Home Care from May to October 2007, and then from April 2008 through July 2009. CW3 referred patients to Professional Home Care in exchange for $800 per patient per month ($400 of that kickback was to be paid to the patients). CW3 agreed with Ruiz that he/she would receive $1200 per month for patients that received both skilled nursing and physical therapy services ($700 of that kickback was to be paid to the patients).

12

## CW4 – Patient Recruiter

46.    CW4 worked as a patient recruiter for LTC and Professional Home Care.  CW4 met directly with Luis, who agreed she would pay CW4 $1600 per patient per cycle for patients prescribed physical therapy and $1500 per patient per month for patients prescribed skilled nursing services.  Bank records reflect that LTC paid CW4 $130,000 between October 2007 and July 2009.

47.    CW4 and Luis agreed to similar rates for patient referrals to Professional Home Care.  Bank records reflect that Professional Home Care has paid CW4 $56,000.

48.    CW4 has stated that the patients he/she recruited for LTC and Professional Home Care did not qualify for either skilled nursing care or physical therapy, and that he/she provided false home health aide certificates.  In fact, CW4 never provided any home health aide services, but believes Luis asked for this documentation to make it appear that the recruiting kickback checks were legitimate payments for home health aide services.

## CW5 – Owner of Medical Clinic

49.    CW5 was the owner and operator of a medical clinic that purported to provide prescriptions and POCs for home health care services to Medicare beneficiaries.

50.    CW5 met with Luis, who offered to pay CW5 for patient referrals in the amount of $1400 per patient, per cycle for patients prescribed physical therapy and $1500 per patient, per month for patients prescribed skilled nursing services.  CW5 declined this offer.

51.    CW5 received a call in 2008 from Luis, who requested that doctors employed by the clinic sign false POCs for Luis in exchange for $500 per POC.  CW5 declined this offer.

52.    A patient recruiter for LTC also brought patients to the clinic in order to receive prescriptions and POCs for these patients.  The recruiter explained that LTC paid him kickbacks

for each patient he recruited for LTC; these patients did not qualify for the prescribed medical services.

### CW6 – Nurse/Patient Recruiter

53.     CW6 worked as a nurse at LTC from approximately 2009 through 2010.  CW6 was employed purportedly to provide nursing services at LTC to approximately 15-17 patients. However, these patients did not qualify for skilled nursing home health visits, and many were not even diabetic.  CW6 stated that he/she visited the patients at LTC approximately 2 to 3 times per week, instead of the 14 times he/she indicated in LTC's records.  Instead of providing skilled nursing care, CW6 visited the patients only in order to have the patients sign visit logs for days that CW6 was not there.

54.     CW6 stated that he/she subsequently began recruiting his/her own patients and approached Acevedo at LTC and discussed recruiting patients for LTC in exchange for kickbacks.  Acevedo told CW6 that LTC in general had grown too large and the amount of patients at LTC looked suspicious.  Acevedo explained, however, that she had another home health agency where CW6 could bring his/her recruited patients.  Acevedo told CW6 to bring his/her patients to Professional Home Care, and directed CW6 to meet with one of the owners of Professional Home Care (as listed in its Articles of Incorporation).

55.     CW6 met with the owner, who agreed to pay CW6 approximately $1300 per patient per month for patients prescribed skilled nursing services.  The owner also agreed to pay CW6 approximately $1000 per patient per physical therapy cycle.

56.     CW6 recruited approximately 5-7 patients for Professional Home Care and also worked there as a nurse.  CW6 has admitted that the patients he/she recruited at Professional

Home Care did not qualify for the services being billed to Medicare, and many were not even diabetic.

57.     False documentation for CW6's recruited patients, including home health prescriptions and signed POCs, were received from a particular doctor. CW6 explained that he/she paid the doctor's office administrator cash kickbacks of $200 per POC in exchange for the doctor's signature. This doctor was previously indicted in the District Court for the Southern District of Florida (Case no. 11-CR-20113) for his role in other home health frauds, and subsequently pled guilty for prescribing home health services that were not medically necessary.

### CW7 – Patient Recruiter

58.     CW7 stated that he/she recruited Medicare beneficiaries and paid them kickbacks to participate in the fraudulent schemes at LTC and Professional Home Care. CW7 agreed with another patient recruiter for LTC to transfer CW7's patients from another home health care agency to LTC in exchange for $1200 per month per patient if the patient was prescribed skilled nursing and $1000 if the patient was prescribed physical therapy. Those rates were later increased to $1500 per patient after CW7 threatened to leave LTC and transfer his/her patients to another home health agency.

59.     CW7 stated that when he/she moved over to LTC, he/she was joined by CW1, who was assigned to act as the nurse for CW7's patients because CW1 was aware that the patients did not in fact need the skilled nursing services that had been prescribed for them. CW7 met directly with his/her patients and agreed to pay them kickbacks.

60.     CW7 also recruited a patient for Professional Home Care, for whom he/she was paid $1200 per month.

### CW8 – Patient Recruiter

61.     CW8 acted as a patient recruiter for Professional Home Care.  CW8 recruited a patient and agreed with Ruiz to receive in exchange approximately $1200 per month for the prescribed skilled nursing services and another approximately $800 per cycle for the physical therapy services.  CW8 was aware that the patient did not require the medical services that were prescribed for him.

### DISSIPATION OF ASSETS

62.     Both LTC and Professional Home Care completed multiple Authorization Agreements for Electronic Funds Transfer, by which they agreed to accept Medicare payments via direct deposit into their bank accounts at SunTrust Bank, Bank Atlantic, and International Finance Bank.  For LTC, the Electronic Funds Transfer Agreements ("EFTs") were signed by Sila Luis, and Myriam Acevedo was listed as the contact person.  For Professional Home Care, the EFTs were signed by Sila Luis's husband at the time, and Elsa Ruiz was listed as the contact person.

63.     From January 2006 through July 2009, Medicare deposited approximately **$38 million** into LTC's corporate bank accounts, either through checks or electronic funds transfers.

64.     From November 2007 through June 2012, Medicare deposited approximately **$7 million** into Professional Home Care's corporate bank accounts, either through checks or electronic funds transfers.

65.     These deposits by Medicare to LTC and Professional Home Care were in payment for the fraudulent claims submitted by LTC and Professional Home Care.

66.     Defendants implemented schemes to transfer these Medicare monies to themselves both directly and by using shell companies.  Evidence gathered during the

16

government's investigation indicates that Defendant Luis had family members open shell companies, and that Luis would transfer monies to these companies. In addition, a recruiter for LTC opened a shell company that would receive checks directly from LTC, money which the recruiter would then use to pay kickbacks to beneficiaries.

67.     Defendants also withdrew substantial amounts of cash from LTC's and Professional Home Care's corporate accounts in order to pay kickbacks in furtherance of their fraudulent schemes.

68.     Defendants also used Medicare monies for foreign travel, to pay substantial salaries to themselves, to purchase multiple properties, and to purchase luxury cars.

69.     For example, of the monies paid by Medicare, Defendant Sila Luis received approximately $4.49 million; Myriam Acevedo received approximately $1.52 million (with almost another million going to a company she owned); and Elsa Ruiz received close to $900,000 (she appears to have received more indirectly). As another example, approximately $225,000 of Medicare monies went to Mercedes Benz for luxury automobiles.

70.     From at least January 2006 to the present, Defendants have systematically dissipated the vast majority of the funds received from Medicare by writing checks and making transfers from LTC's and Professional Home Care's bank accounts to themselves, other entities they control, and to third parties to pay for kickbacks, real estate and personal luxury items.

71.     Although Medicare has paid Defendants, through LTC and Professional Home Care, $45 million since January 2006, the United States has only been able to locate assets totaling a fraction of that amount. Defendants appear to have dissipated tens of millions of dollars in Medicare funds, and unless enjoined will continued to dissipate the proceeds of their Medicare fraud.

## COUNT I
### (18 U.S.C. § 1345 – Injunctive Relief)

72.     The United States realleges and incorporates by reference paragraphs 1 through 71 of this Complaint as though fully set forth herein.

73.     Among other things, Defendants committed a Federal health care offense, as defined in 18 U.S.C. § 24, by conspiring to commit health care fraud, conspiring to defraud the United States and to pay health care kickbacks, and by actually paying health care kickbacks in connection with a federal health care benefit program, in violation of 18 U.S.C. §§ 1349, 371, and 42 U.S.C. § 1320a-7b(b)(2)(A).

74.     Defendants have already dissipated millions of dollars in proceeds of that fraud, and intend to continue dissipating the remainder of the proceeds of the fraud.

43.     Defendants' fraud upon Medicare is a fraud against the United States and constitutes a continuing and substantial injury to the United States and its citizens.

75.     The United States brings this action to protect Medicare and other funds by restraining Defendants' unlawful fraudulent conduct and to protect and restrain the transfer of funds and assets now in Defendants' hands as ill-gotten gains from their fraud upon the Medicare program.

76.     Upon a showing that Defendants are committing or about to commit a Federal health care offense, the United States is entitled, under 18 U.S.C. § 1345(a)(1), to a temporary restraining order, a preliminary injunction, and a permanent injunction, restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to the United States.

18

77.     Upon a showing that defendants are alienating or disposing, or intend to alienate or dispose, property obtained as the result of a Federal health care offense, the United States is entitled, under 18 U.S.C. § 1345(a)(2), to a temporary restraining order, a preliminary injunction, and a permanent injunction, enjoining defendants from alienating, disposing, withdrawing, transferring, removing, dissipating, or disposing of any property obtained as a result of a Federal health care offense, property traceable to such violation, or property of equivalent value.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America prays that this Court:

Issue a Temporary Restraining Order and Preliminary Injunction in this matter against Defendants, and that a permanent injunction shall be issued forthwith, that orders that Defendants, their agents, servants, employees, attorneys, and all persons acting in concert and participation with Defendants, including all corporations over which they exercise control, be enjoined as follows:

1.     From making or conspiring to make any false claims to the Medicare Program or any health care benefit program, or otherwise from committing any Federal health care offense, as defined in 18 U.S.C. § 24;

2.     From withdrawing or transferring any moneys or sums presently deposited, or held on behalf of Defendants by any financial institution, trust fund, or other financial agency, public or private, that are proceeds from false, fictitious, or fraudulent claims made by Defendants, or any moneys of an equivalent value to those taken through false, fictitious, or fraudulent claims;

3.     From transferring, selling, assigning, dissipating, concealing, encumbering, impairing or otherwise disposing of, in any manner, assets, real or personal;

19

4.    To preserve all business, financial, and accounting records, including bank records, that detail Defendants' business operation and disposition of any payment that directly or indirectly arose from the payment of money to Defendants on behalf of the Medicare Program;

5.    To preserve all medical records, including patient records, which relate to defendants' business operation(s) and/or to services for which claims were submitted to the Medicare Program;

6.    To provide an accounting of all assets, within seven calendar days, and to provide on a monthly basis, commencing forthwith, suitable reports detailing its financial condition; and

7.    To complete a Financial Disclosure Statement form provided to Defendants by the United States within seven calendar days;

8.    For disgorgement and restitution of all of Defendants' ill-gotten gains attributable to their fraud upon the United States; and

9.    For such other and further relief as the Court shall deem just and proper.

Dated:  October 2, 2012

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:   *s/Susan Torres*
      Susan Torres
      Assistant United States Attorney
      Florida Bar No. 133590
      Susan.Torres@usdoj.gov
      99 N.E. 4th Street, Third Floor
      Miami, Florida  33132
      Telephone: (305) 961-9331
      Facsimile: (305) 530-7139
      *Counsel for the United States of America*