UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-23588

CIV - HUCK

FILED by _____ D.C.

OCT 02 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA

    Plaintiff,

v.

SILA LUIS, ELSA RUIZ, and
MYRIAM ACEVEDO,

**FILED UNDER SEAL**

    Defendants.

_____/

## UNITED STATES' EMERGENCY *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW

Pursuant to 18 U.S.C. § 1345 and Local Rule 7.1(e)[1], the United States of America ("United States") seeks a temporary restraining order, preliminary injunction, and other equitable relief in this matter to prevent further losses to the United States as a result of Defendants' scheme to defraud the Medicare program. The government has thus far identified losses to federal health care programs of over $45 million stemming from a scheme, implemented through an elaborate web of kickbacks, to submit fraudulent claims for home health services that were neither performed nor medically necessary.

The United States moves on an emergency basis because, as explained further below, the Defendants are expected to be arrested in a related criminal case, and search warrants are expected to be executed, on Thursday, October 4, 2012. The TRO must be in place sufficiently before then to give time for the financial institutions to freeze Defendants' accounts, so

---

[1] Although Federal Rule of Civil Procedure 65 typically governs the filings of injunctions, the injunction requested herein is sought pursuant to specific statutory injunction authority, and thus, as explained further below, many of the procedural requirements of Rule 65 do not apply.

Defendants and their co-conspirators do not dissipate their assets further once they learn of the arrests.

Because the United States has established that Defendants have committed, and are continuing to commit, federal health care fraud offenses and have dissipated proceeds of such fraud, the United States seeks injunctive relief under 18 U.S.C. § 1345 to: (1) enjoin Defendants' fraudulent conduct, and (2) freeze Defendants' assets – assets derived from the fraud or of an equivalent value to the fraud proceeds – to preserve the status quo and ensure that sufficient assets are available to satisfy any judgment requiring restitution or forfeiture.

## I. STATEMENT OF FACTS

The United States has gathered overwhelming evidence that Defendants engaged in a widespread scheme, spanning multiple years, to submit false and fraudulent claims for home health services – primarily diabetic skilled nursing care and physical therapy – that were not medically necessary and/or never provided at all. *See* Decl. of FBI Special Agent Clint E. Warren in Support of Mot. for Temporary Restraining Order & Preliminary Injunction ("Warren Decl."). Defendants built this scheme through extensive kickback payments to nurses and patient recruiters. *Id.* ¶ 28. Those patient recruiters would then pay kickbacks to Medicare beneficiaries in exchange for their agreement to be placed at Defendants' companies, LTC Professional Consultants, Inc. ("LTC") and Professional Home Care Solutions, Inc. ("Professional Home Care"). *Id.* ¶ 29. LTC and Professional Home Care would then use the Medicare information for those beneficiaries to submit fraudulent claims to the Medicare program. *Id.*

Through these actions, Defendants have violated numerous federal statutes, including those involving health care fraud, and have submitted false, fraudulent, or fictitious statements

and/or claims to the United States. In particular, Defendants have violated 18 U.S.C. § 1349 (conspiracy to commit health care fraud), 18 U.S.C. § 371 (conspiracy to defraud the United States and to pay health care kickbacks), and 42 U.S.C. § 1320a-7b(b)(2)(A) (payment of kickbacks in connection with a federal health care benefit program), and they are expected to be charged with these offenses in a related criminal case. All of these statutes qualify as "Federal health care offenses," as that term is defined in 18 U.S.C. § 24. And the commission of federal health care offenses triggers the availability of injunctive relief under 18 U.S.C. § 1345.

## THE MEDICARE PROGRAM

The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are over the age of sixty-five or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b). *See* Warren Decl. ¶¶ 4-5.

### Medicare Coverage of Home Health Services

At all times relevant to the Complaint, "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA") to beneficiaries who required home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary. *Id.* ¶ 6.

Physicians, clinics and other health care providers, including HHAs, that provided

services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services. *Id.* ¶ 7.

The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits. A patient qualified for home health benefits only if:

    a.    the patient was confined to the home, also referred to as homebound;

    b.    the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

    c.    the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

*Id.* ¶ 8.

HHAs were reimbursed under the Home Health Prospective Payment System ("PPS"). Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care." The

base payment was adjusted based on the health condition and care needs of the beneficiary. This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition. If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits. *Id.* ¶ 9.

CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims. As administrator, Palmetto was to receive, adjudicate, and pay claims submitted by HHA providers under the Part A program for home health claims. *Id.* ¶ 10.

In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60 day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" are additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount. *Id.* ¶ 11.

Medicare regulations allowed certified home health agencies to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn,

bill the certified home health agency. That certified home health agency would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees. *Id.* ¶ 12.

For insulin-dependant diabetic beneficiaries, Medicare paid for insulin injections by an HHA agency when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary. Additionally, for beneficiaries for whom occupational or physical therapy was medically necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home health services was a continuing requirement for Medicare to pay for such home health benefits. *Id.* ¶ 13.

While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries that had the most extensive care needs, which may result in an Outlier Payment to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible. *Id.* ¶ 14.

### Record Keeping Requirements

Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses

of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program. *Id.* ¶ 15.

Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS. *Id.* ¶ 16.

Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes"

and "home health aide notes/observations." Medicare regulations require that home health agencies maintain medical records for at least seven years. *Id.* ¶ 17.

## DEFENDANTS' FRAUDULENT SCHEME

According to cooperating witnesses, LTC and Professional Home Care paid kickbacks and bribes to nurses and patient recruiters so that they would place patients with LTC and Professional Home Care. LTC and Professional Home Care would then fraudulently bill Medicare for home health and therapy services that were not medically necessary and/or not provided. Patient recruiters would, in turn, pay Medicare beneficiaries kickbacks for agreeing to be placed at LTC and Professional Home Care. According to the cooperating witnesses, recruited beneficiaries accepted these kickbacks in return for allowing LTC and Professional Home Care to fraudulently bill the Medicare program for home health services that were not medically necessary and/or not provided. *Id.* ¶¶ 28-29. According to various cooperating witnesses, employees at LTC and Professional Home Care caused patient files to be falsified in order to make it appear that Medicare beneficiaries qualified for and received home health services that in reality were not medically necessary and not provided. *Id.* ¶ 31.

The bulk of the services for which LTC and Professional Home Care billed were diabetic skilled nursing care and/or physical therapy. LTC and Professional Home Care sought out purportedly diabetic patients because of the ability to fraudulently bill the Medicare program for skilled nursing visits two or three times per day for each beneficiary, resulting in high reimbursements for those patients. *See, e.g., id.* ¶ 34. From January 2006 through July 2009, LTC billed the Medicare program approximately $63 million for home health services for approximately 1495 beneficiaries, and it was paid more than $38 million. Of this $63 million, approximately $56 million represented billings to Medicare for diabetic skilled nursing care

and/or physical therapy. *Id.* ¶ 26. The same is true for Professional Home Care. From November 2007 through June 2012, Professional Home Care billed the Medicare program approximately $11 million for home health services for approximately 408 beneficiaries, and it was paid more than $7 million. Of this $11 million, approximately $10.5 million represented billings to Medicare for diabetic skilled nursing care and/or physical therapy. *Id.* ¶ 27.

Witnesses cooperating with the government have provided detailed information substantiating Defendants' fraud scheme. The cooperating witnesses include nurses and patient recruiters for LTC and Professional Home Care, and the owner of a medical clinic who was offered a part in the fraud scheme by Defendant Luis. *Id.* ¶ 25.

Several cooperating witnesses who worked as nurses for Defendants' companies have explained that, soon after beginning their work, they learned that the patients at LTC and Professional Home Care were being paid and did not qualify for the home health services being billed to the Medicare program. They stated that LTC and Professional Home Care sought out purportedly diabetic beneficiaries because of the ability to submit multiple claims, which in some cases resulted in fraudulent Medicare billings and payments exceeding $14,000 per 60-day period for each beneficiary. These nurses stated that although their nursing notes indicated they visited the patients two or three times a day, in reality, they almost never visited the patients or provided services. They would have the patients sign visit logs for visits that were never provided. *Id.* ¶¶ 34-35, 37-38, 42-43.

One of these nurses also explained that he/she worked with an employee from LTC's quality control department to prepare the required nursing notes. The nurse paid the LTC employee $2 per patient note, which the LTC employee then completed on the nurse's behalf. The nurse would provide the LTC employee with weekly blood sugar logs, and the LTC

employee would complete the notes and add symptoms to match the symptoms on the patient's POCs. The nurse stated that this was done by the LTC employee so that the services appeared legitimate, even though the symptoms did not exist. The nurse explained that he/she had the notes completed in the same manner at Professional Home Care. *Id.* ¶ 39.

Six different cooperating witnesses served as patient recruiters for LTC, Professional Home Care, or both. They all stated that they were paid a set amount per patient, per month or cycle, with the amount depending on whether the patients were recruited for skilled nursing visits or physical therapy. For those patients purportedly receiving skilled nursing visits, the recruiters were paid between $1200 and $1500 per patient, per month. For those patients purportedly receiving physical therapy, the recruiters were paid between $600 and $1500 per patient, per cycle. Different recruiters received different amounts, and at least one recruiter demanded, and was paid, an increased amount after threatening to take the recruiter's patients elsewhere. *Id.* ¶ 57. Defendants directly paid the recruiters their kickbacks in cash or by check. *Id.* ¶¶ 40, 44, 45-46, 54, 57, 59, 60. It was understood that the recruiters would use a portion of their kickbacks to pay kickbacks to the beneficiaries they recruited. *Id.* ¶ 44.

The recruiters understood that the patients they were placing with LTC and Professional Home Care did not qualify for home health services such as skilled nursing care or physical therapy. *Id.* ¶¶ 47, 55, 60. One recruiter was also asked to provide false home health aide certificates, even though no home health aide services were ever provided. The recruiter understood that Defendant Luis wanted such documentation to make it appear that the checks paid to this recruiter were legitimate payments for home health aide services. *Id.* ¶ 47.

One recruiter also explained how he/she would pay kickbacks to a doctor's office for signed POCs for the recruiter's patients. The doctor identified by the recruiter was previously

indicted in this District for his role in other home health frauds, which similarly involved prescribing home health services that were not medically necessary. *Id.* ¶ 56.

Another cooperating witness was the owner of a medical clinic that purportedly provided prescriptions and POCs for home health care services to Medicare beneficiaries. The clinic owner met with Defendant Luis, who offered the clinic owner $1400 per patient, per cycle for patients prescribed physical therapy and $1500 per patient, per month for patients prescribed skilled nursing services. *Id.* ¶¶ 48-49.

Defendant Luis later called the clinic owner and requested that doctors employed by the clinic sign false POCs for Luis in exchange for $500 per POC. A patient recruiter for LTC also brought patients to the clinic in order to receive prescriptions and POCs for these patients. The recruiter explained that LTC paid the recruiter kickbacks for each patient recruited for LTC, even though these patients did not qualify for the prescribed medical services. *Id.* ¶¶ 50-51.

## DISSIPATION OF ASSETS

Both LTC and Professional Home Care completed multiple Authorization Agreements for Electronic Funds Transfer, by which they agreed to accept Medicare payments via direct deposit into their bank accounts at SunTrust Bank, Bank Atlantic, and International Finance Bank. For LTC, the Electronic Funds Transfer Agreements ("EFTs") were signed by Sila Luis, and Myriam Acevedo was listed as the contact person. For Professional Home Care, the EFTs were signed by Sila Luis's husband at the time, and Elsa Ruiz was listed as the contact person. *Id.* ¶¶ 61.

From January 2006 through July 2009, Medicare deposited approximately **$38 million** into LTC's corporate bank accounts, either through checks or electronic funds transfers. *Id.* ¶ 62. From November 2007 through June 2012, Medicare deposited approximately **$7 million** into

Professional Home Care's corporate bank accounts, either through checks or electronic funds transfers. *Id.* ¶ 63. These deposits by Medicare to LTC and Professional Home Care were in payment for the fraudulent claims submitted by LTC and Professional Home Care. *Id.* ¶ 64.

Defendants implemented schemes to transfer these Medicare monies to themselves both directly and by using shell companies. Evidence gathered during the government's investigation indicates that Defendant Luis had family members open shell companies, and that Luis would transfer monies to these companies. In addition, a recruiter for LTC opened a shell company that would receive checks directly from LTC, money which the recruiter would then use to pay kickbacks to beneficiaries. *Id.* ¶ 65.

Defendants also withdrew substantial amounts of cash from LTC's and Professional Home Care's corporate accounts in order to pay kickbacks in furtherance of their fraudulent schemes. *Id.* ¶ 66. Defendants also used Medicare monies for foreign travel, to pay substantial salaries to themselves, to purchase properties, and to purchase luxury cars. *Id.* ¶ 67. For example, of the monies paid by Medicare, Defendant Sila Luis received approximately $4.49 million; Myriam Acevedo received approximately $1.52 million (with almost another million going to a company she owned); and Elsa Ruiz received close to $900,000 (she appears to have received more indirectly). As another example, approximately $225,000 of Medicare monies went to Mercedes Benz for luxury automobiles. *Id.* ¶ 68.

From at least January 2006 to the present, Defendants have systematically dissipated the vast majority of the funds received from Medicare by writing checks and making transfers from LTC's and Professional Home Care's bank accounts to themselves, other entities they control, and to third parties to pay for kickbacks, real estate and personal luxury items. *Id.* ¶ 69.

Although Medicare has paid Defendants, through LTC and Professional Home Care, $45 million since January 2006, the United States has only been able to locate assets totaling a fraction of that amount. Defendants appear to have dissipated tens of millions of dollars in Medicare funds, and unless enjoined will continued to dissipate the proceeds of their Medicare fraud. *Id.* ¶ 70. Therefore, the United States seeks to restrain all assets of Defendants that are proceeds or profits from Defendants' Federal health care offenses or property of an equivalent value of such proceeds or profits.

II. **MEMORANDUM OF LAW**

   A. **Federal Law Authorizes Injunctions To Prohibit the Commission of Fraud Against the United States, the Commission of Federal Health Care Offenses, and the Dissipation of Proceeds of Such Fraud**

Injunctive relief to restrain a violation of a Federal health care offense and the dissipation of assets is authorized by 18 U.S.C. § 1345 ("section 1345" or "fraud injunction statute"). *See, e.g., United States v. DBB, Inc., et al.*, 180 F.3d 1277, 1283 (11th Cir. 1999); *United States v. Fang*, 937 F. Supp. 1186, 1192 (D. Md. 1996). In relevant part, 18 U.S.C. § 1345 provides that:

   (a)(1) If a person is –

   (A)  violating or about to violate this chapter or section 287, 371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof), or 1001 of this title; . . . [or]

   (C)  committing or about to commit a Federal health care offense,

   the Attorney General may commence a civil action in any Federal court to enjoin such violation.

   (2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of . . . a Federal health care offense or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court–

   (A)  to enjoin such alienation or disposition of property; or

   (B)  for a restraining order to –

13

> (i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and
>
> (ii) appoint a temporary receiver to administer such restraining order.

The fraud injunction statute further states that the Court may take such other action as is warranted to prevent a continuing and substantial injury to the United States. 18 U.S.C. § 1345(b).

Essentially, section 1345 provides two independent avenues of injunctive relief, each or both of which are available in any given case where a defendant is committing, or has disposed or intends to dispose of funds obtained by committing, a "Federal health care offense." That term is defined in 18 U.S.C. § 24(a)[2] and covers numerous crimes, including conspiracy to commit health care fraud, 18 U.S.C. § 1349,[3] conspiracy to defraud the United States, 18 U.S.C. § 371,[4] and crimes against federal health care programs such as the paying of kickbacks, 42 U.S.C. § 1320a-7b(b)(2).[5] An injunction pursuant to this section can reach not just the actual

---

[2] 18 U.S.C. § 24 states:

> As used in this title, the term "Federal health care offense" means a violation of, or a criminal conspiracy to violate–
> (1) section 669, 1035, 1347, or 1518 of this title;
> (2) section 287, 371, 664, 666, 1001, 1027, 1341, 1343, or 1954 of this title, if the violation or conspiracy relates to a health care benefit program.

[3] 18 U.S.C. § 1349 provides:

> Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

[4] 18 U.S.C. § 371 states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both. . . .

[5] 42 U.S.C. § 1320a-7b(b)(2) provides:

assets that are directly traceable to the fraud, but can also reach "property of equivalent value." 18 U.S.C. § 1345(a)(2)(B)(i); *DBB, Inc.*, 180 F.3d at 1283, 1286.

In this case, the facts establish that Defendants – through operation of LTC and Professional Home Care, and the submission of claims by these entities to Medicare – are committing several Federal health care offenses, including, 18 U.S.C. § 1349 (conspiracy to commit health care fraud), 18 U.S.C. § 371 (conspiracy to defraud the United States), and 42 U.S.C. § 1320a-7b(b)(2) (crimes against federal health care programs such as the paying of kickbacks). The facts also establish that Defendants have dissipated and could still dissipate the property and assets obtained as a result of their fraud.

Therefore, a temporary restraining order and preliminary injunction with respect to both (1) the ongoing fraud and (2) the dissipation of proceeds of the fraud as well as equivalent assets is warranted under 18 U.S.C. § 1345. Since the scope of the fraud in this case is large, totaling approximately $45 million paid, and the injunction can freeze both traceable and non-traceable assets, the United States seeks an injunction to freeze all of the assets in which Defendants have an interest up to the equivalent value of the proceeds of the scheme to defraud.

In addition, although the United States has identified some of the companies utilized by Defendants in this scheme, it is possible that other companies not yet identified are engaging in the fraud as well, either via the submission of the false claims, conspiracy to submit false claims tainted with illegal kickback payments, or by acting as a vehicle to conceal and dissipate the fraud proceeds. Thus, the United States seeks an injunction that encompasses all fraud

---

whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-- **(A)** to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

perpetrated by Defendants and those acting in concert and participation with them, irrespective of the specific corporate vehicle used for that purpose. This approach is necessary to effectuate a proper remedy under the statute.

Pursuant to 18 U.S.C. § 1345 and the general equitable power of the Court, the United States is asking this Court to enter a temporary restraining order and preliminary injunction in order to prevent a continuing and substantial injury to the United States by halting the submission of false claims by Defendants, and by preventing the disposition and concealment of fraudulently acquired funds and assets presently in the hands of Defendants, and by freezing any funds or assets of equivalent value.

### B. Prior Notice to the Defendants Is Unnecessary When Notice Could Cause the Very Harm the Application Seeks To Prevent

The issuance of the temporary restraining order without prior notice is necessary in this case. If advance notice of the motion for the temporary restraining order were given to the Defendants, it is possible that the assets would immediately be transferred beyond the reach of the United States. This is especially true where the technology of electronic transfers is in the hands of unscrupulous operators who have already defrauded the United States of tens of millions of dollars. To provide advance notice to Defendants would simply tip Defendants off and invite them to transfer the funds, thereby accentuating the very harm that this motion seeks to prevent.

In these circumstances, the law provides for the issuance of *ex parte* temporary restraining orders. As stated by the court in *In the Matter of Vuitton Et Fils S.A.*, 606 F.2d 1, 5 (2nd Cir. 1979): "If notice is required, that notice all too often appears to serve only to render fruitless further prosecution of the action. This is precisely contrary to the normal and intended role of 'notice,' and it is surely not what the authors of the rule either anticipated or intended."

*Id.*; *see also Calero-Toledo v. Pearson Yacht Leasing Company*, 416 U.S. 663, 679 (1974) (pre-seizure notice and hearing not necessary where such procedure might frustrate the interests served by the statutes)[6]; *Little Tor Auto Center v. Exxon Company USA*, 822 F. Supp. 141, 143 (S.D.N.Y. 1993) (*ex parte* procedure allowed in connection with TRO application "where advance contact with the adversary would itself be likely to trigger irreparable injury"). It is appropriate that the United States' application be granted without prior notice to the Defendants. Defendants can be fully protected by prompt post-seizure notice and opportunity for a hearing, both of which can be required by the terms of the temporary restraining order itself and have in fact been incorporated into the Proposed Order submitted herewith.

      **C.**    **The Traditional Prerequisites to a Temporary Restraining Order Are Not Applicable When the Government Seeks an Injunction Pursuant to a Federal Statute That Was Enacted To Protect the Public Interest**

The traditional test for the issuance of a temporary restraining order does not apply where the United States is seeking an injunction pursuant to a federal statute that was enacted to protect the public interest and that authorizes injunctive relief. *United States v. Medina*, 718 F. Supp. 928, 930 (S.D. Fla. 1989). Under such circumstances the United States is not required to demonstrate irreparable harm in order to obtain an injunction. *Id.*; *U.S. v. Livdahl*, 356 F. Supp. 2d 1289, 1293-94 (S.D. Fla. 2005); *U.S. v. Sene X Eleemosynary Corp., Inc.*, 479 F. Supp. 970, 981 (S.D. Fla. 1979). "The passage of the statute is, in a sense, an implied finding that violations

---

[6] *Calero-Toledo* relied upon and reaffirmed the Supreme Court's earlier finding that seizure of property without a hearing is constitutionally permissible and does not violate due process notice requirements where "[f]irst . . . the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." *Calero-Toledo*, 416 U.S. at 679, *citing Fuentes v. Shevin*, 407 U.S. 67, 91 (1972). As reflected by Congress' amendment of § 1345 to include Federal health care offenses, all three identified concerns are satisfied in § 1345 health care fraud cases.

will harm the public and ought, if necessary, be restrained." *U.S. v. Diapulse Corp. of America*, 457 F.2d 25, 28 (2nd Cir. 1972).

"Where an injunction is authorized by statute, it is proper to issue such an order to restrain violations of the law if the statutory conditions are satisfied." *Sene X Eleemosynary Corp., Inc.*, 479 F. Supp. at 980. Florida District Courts have repeatedly found in section 1345 cases "that because both statutes expressly authorize injunctive relief, no specific finding of irreparable harm is necessary, no showing of the inadequacy of other remedies at law is necessary, and no balancing of the interests of the parties is required prior to the issuance of a preliminary injunction in this case." *Livdahl*, 356 F. Supp. 2d at 1290-91. Thus, the government does not need to establish the inadequacy of other remedies at law, and no balancing of the interests of the parties is required. *Id.*; *Medina*, 718 F. Supp. at 930; *Sene X Eleemosynary Corp*, 479 F. Supp. at 981.

In order for the court to issue an injunction there need only be a showing that a defendant has violated the statute and that there exists "some cognizable danger of recurrent violation." *Medina*, 718 F. Supp. at 930; *Sene X*, 479 F. Supp. at 981. The government satisfies its burden under section 1345 when it shows that there is "probable cause" to believe that the defendant is violating, about to violate, or that there is some cognizable danger of recurrent violation of any of the sections specified in section 1345. *U.S. v. Livdahl*, 356 F. Supp. 2d at 1293-94; *see also DBB*, 180 F.3d at 1280 (noting District Court adopted Magistrate Judge's findings of a "reasonable probability"); *U.S. v. Payment Processing Center, LLC*, 461 F. Supp. 2d 319, 323 (E.D. Pa. 2006) (citing "probable cause, i.e., a fair probability"); *U. S. v. Fang*, 937 F. Supp. 1186, 1197 (D. Md. 1996) ("Given this background, the Court is prepared to conclude that the 'reasonable probability' standard of conventional preliminary injunction analysis equates with

18

'probable cause' and that it applies in the present [§ 1345] case."); *U.S. v. William Savran & Associates, Inc.*, 755 F. Supp. 1165, 1180 (E.D.N.Y. 1991); *U.S. v. Belden*, 714 F. Supp. 42, 45-46 (N.D.N.Y. 1987) (examining the legislative history and noting "it is unlikely that Congress intended to hold the government to a more stringent standard than that of probable cause when relief under § 1345 was sought"). Once the government establishes probable cause to believe that a defendant has violated the statute, the burden shifts to the defendant to show that "there is no reasonable expectation that the wrong will be repeated." *Sene X,* 479 F. Supp. at 981.

In sum, the United States is entitled to the requested injunction by showing that there is probable cause to believe that Defendants are violating Federal health care statutes, or have violated such statutes and that there is some cognizable danger of recurrent violation, or that Defendants have dissipated or are still attempting to dissipate the proceeds of their fraud. At that point, the United States has satisfied its burden. Defendants, if opposed to the issuance of an injunction as to any funds or assets, bear the burden of establishing that such funds or assets are not related to the fraud or are beyond the equivalent value of the funds taken through the fraud. This will be a difficult burden to satisfy in this case, given that Defendants were paid over $45 million by Medicare – in reimbursement for claims that are virtually all believed to be tainted by unlawful kickbacks and for services that were medically unnecessary and/or not performed – and yet the United States has been able to locate assets of Defendants totaling only a fraction of that amount. A broad injunction freezing Defendants' assets is therefore appropriate.

## CONCLUSION

The investigation conducted by the United States has uncovered overwhelming evidence that Defendants are submitting fraudulent Medicare claims, are dissipating the assets gained through their illegal conduct, and, unless an injunction is issued, will continue to dissipate the

remaining proceeds of their fraud. The facts summarized above and in the Declaration of Special Agent Clint E. Warren establish that Defendants are violating 18 U.S.C. §§ 1349, 371, and 42 U.S.C. § 1320a-7b, and are committing and unless enjoined will likely continue to commit Federal health care offenses, by presenting or causing the presentation of fraudulent claims to Medicare and other health care benefit programs. Also, the Declaration demonstrates that Defendants are dissipating the proceeds of their Medicare fraud. Accordingly, injunctive relief under 18 U.S.C. § 1345(a)(1) and (a)(2) is warranted.

WHEREFORE, the United States requests that this Court, pursuant to 18 U.S.C. § 1345, grant its motion for a temporary restraining order and preliminary injunction, and other equitable relief in this case. A proposed Order is submitted herewith.

Dated: October 2, 2012                    Respectfully submitted,

                                          WIFREDO A. FERRER
                                          UNITED STATES ATTORNEY

                                     By:  s/Susan Torres
                                          Susan Torres
                                          Assistant United States Attorney
                                          Florida Bar No. 133590
                                          Susan.Torres@usdoj.gov
                                          99 N.E. 4th Street, Third Floor
                                          Miami, Florida 33132
                                          Telephone: (305) 961-9331
                                          Facsimile: (305) 530-7139
                                          *Counsel for United States of America*