**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 12-23588-CIV-HUCK

UNITED STATES OF AMERICA,

      Plaintiff,

v.

SILA LUIS, ELSA RUIZ, and
MYRIAM ACEVEDO,

      Defendants.

_____/

**RESPONSE OF THE UNITED STATES TO DEFENDANT**
**SILA LUIS'S MOTION TO MODIFY THE RESTRAINING ORDER**
**TO RELEASE ASSETS FOR THE DEFENSE OF THE CRIMINAL CASE**

Defendant Sila Luis and her co-defendants have been criminally charged with defrauding the federal Medicare program of at least $45 million. Pursuant to 18 U.S.C. § 1345, a statute specifically created to preserve assets in fraud cases such as this one, the United States filed this action to maintain the status quo, thus far freezing only about $2 million in assets of the Defendants, a small fraction of the amount lost to the fraud. Defendant Luis now seeks the release of these limited funds to hire her preferred criminal defense counsel. The Court should deny her request, because the release of assets is not warranted under the circumstances of this case, and neither the Fifth nor Sixth Amendment requires it. Indeed, to release any of Defendant Luis's assets would contravene the clear Congressional intent behind Section 1345 – to preserve assets for restitution to the victims of fraud, here the Medicare program.

**BACKGROUND**

The United States filed its Complaint in this action seeking injunctive relief under 18 U.S.C. § 1345, also known as the fraud injunction statute ("Section 1345"), both to enjoin what it

alleged was ongoing health care fraud and to freeze Defendants' assets – assets derived from the fraud or of an equivalent value to the fraud proceeds – to preserve the status quo pending any future judgment requiring restitution or forfeiture in criminal proceedings against the Defendants.  Defendants were subsequently arrested in the criminal case and charged with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; conspiracy to defraud the United States and to pay health care kickbacks, in violation of 18 U.S.C. § 371; and payment of kickbacks in connection with a federal health care benefit program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).  *See United States v. Luis et al.*, No. 12-20751-Cr-Cooke (S.D. Fla.) (Indictment, DE #3).  The indictment also identified for forfeiture a number of bank accounts and properties owned by the Defendants, and it asserted a claim for substitute property pursuant to 21 U.S.C. § 853(p).  *Id.*

## Defendants' Fraudulent Scheme

The Complaint alleges that Defendants engaged in a widespread scheme spanning multiple years to submit false and fraudulent claims for home health services – primarily diabetic skilled nursing care and physical therapy – that were not medically necessary and/or never provided at all.  Defendants implemented this scheme through extensive kickback payments to nurses and patient recruiters.  The patient recruiters would then pay kickbacks to Medicare beneficiaries in exchange for their agreement to be placed at Defendants' companies, LTC Professional Consultants, Inc. ("LTC") and Professional Home Care Solutions, Inc. ("Professional Home Care").  LTC and Professional Home Care would then use the Medicare

information for those beneficiaries to submit fraudulent claims to the Medicare program. Defendant Luis controlled both LTC and Professional Home Care.[1]

From January 2006 through July 2009, LTC billed the Medicare program approximately $63 million for home health services, and it was paid more than $38 million. Of this $63 million, approximately $56 million represented billings to Medicare for diabetic skilled nursing care and/or physical therapy. From November 2007 through June 2012, Professional Home Care billed the Medicare program approximately $11 million for home health services, and it was paid more than $7 million. Of this $11 million, approximately $10.5 million represented billings to Medicare for diabetic skilled nursing care and/or physical therapy. Together, the companies received approximately $45 million from Medicare during the period at issue.

## Dissipation – Potentially Still Ongoing – of Assets

The vast majority of that $45 million, the Complaint alleges, has been dissipated. Substantial amounts of cash (believed to be used for kickbacks) were periodically withdrawn from the corporate accounts. Other funds were transferred to Defendants themselves, family members, or related entities, and they have been used to purchase real property, luxury items, or fund Defendant Luis's foreign travel, including to Cuba and Mexico. Defendant Luis directly received at least $4.5 million in Medicare funds. Her husband Wilfredo Luis received approximately $1.5 million in Medicare funds. They bought and sold multiple properties, often transferring them through quit-claim deeds to others in apparent attempts to conceal their true ownership.

---

[1] The United States' Complaint [DE #1], Motion for Temporary Restraining Order and Preliminary Injunction [DE #4], and the Declaration of FBI Special Agent Clint Warren [DE #5] all contain detailed information regarding Defendants' fraudulent scheme.

And, perhaps most significantly, dissipation appears to continue even in the face of the Court's TRO, which was issued on October 3, 2012. The government has learned that Defendant Luis owned a safety deposit box at City National Bank, the existence of which she never disclosed to the government. Bank records show that a family member of Defendant Luis visited the safety deposit box on Oct. 9, 2012, after that family member had notice of the Court's TRO, but before City National Bank had frozen Defendant Luis's assets there.[2] *See* Exhibit A (records showing Defendant Luis's ownership of the box and log reflecting visits to the box). The bank records indicate that Defendant Luis's family member spent seven minutes inside the vault.

Due in part to Defendants' actions to dissipate proceeds of the fraud, the government thus far has been able to identify only about $2 million in assets of the Defendants (with the vast majority – about $1.7 million – controlled by Defendant Luis). That includes funds in bank accounts currently frozen by the TRO entered by the Court and equity in certain properties owned by Defendants. (Defendant Luis is also believed to own properties and bank accounts in Mexico, but their value is unknown.) The United States believes that the vast majority of these assets are traceable to Medicare proceeds fraudulently obtained by Defendants. The government has not, however, been able to determine definitively which assets are traceable because of the extent to which Defendants transferred funds, bought and sold properties, opened and closed bank accounts, and otherwise took actions that effectively concealed the ultimate use of Medicare monies. While the Court's TRO required that Defendants provide financial disclosure statements to the government, Defendants have not done so. *See* TRO ¶ 7 [DE #11]. Defendant Luis has objected to providing such a statement on Fifth Amendment grounds.

---

[2] The government did not specifically list City National Bank in its first proposed TRO, and learned only later that Defendants had assets there. For this reason, City National Bank was served with the TRO several days after it was issued.

**ARGUMENT**

The fraud injunction statute provides for two kinds of relief: an injunction to prevent a wide variety of fraudulent conduct, 18 U.S.C. § 1345(a)(1); and an injunction to prevent the dissipation of property either obtained as a result of banking law violations or federal health care offenses or "property of equivalent value," 18 U.S.C. § 1345(a)(2).  Thus, the power to freeze assets of equivalent value is limited to cases involving banking and health care fraud.  The statute allows for additional relief to accomplish these purposes, such as the appointment of a receiver to administer orders entered by the court.  18 U.S.C. § 1345(a)(2)(B)(ii); *see also* 18 U.S.C. § 1345(b) (allowing for "such other action, as is warranted to prevent a continuing and substantial injury to the United States").  In her Corrected Motion for Release of Funds for the Defense of the Related Criminal Case ("Corrected Motion") [DE #46], Defendant Luis challenges the applicability to her of subsection 1345(a)(2).

**I.     The United States Has Satisfied Its Burden Under 18 U.S.C. § 1345**

Defendant Luis first argues that the United States has not satisfied its burden to show that the $45 million in losses falls within the scope of the statute.  Section 1345 allows for an asset freeze where there has been a "Federal health care offense."  18 U.S.C. § 1345(a)(2).  The term "Federal health care offense" is defined in 18 U.S.C. § 24(a)[3] and covers numerous crimes,

---

[3]   18 U.S.C. § 24(a) states:

   **(a)** As used in this title, the term "Federal health care offense" means a violation of, or a criminal conspiracy to violate--
      **(1)** section 669, 1035, 1347, or 1518 of this title or section 1128B of the Social Security Act (42 U.S.C. 1320a-7b); or
      **(2)** section 287, 371, 664, 666, 1001, 1027, 1341, 1343, 1349, or 1954 of this title section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 331), or section 501 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1131), or section 411, 518, or 511 of the Employee Retirement Income Security Act of 1974, if the violation or conspiracy relates to a health care benefit program.

including conspiracy to commit health care fraud, 18 U.S.C. § 1349, conspiracy to defraud the United States, 18 U.S.C. § 371, and crimes against federal health care programs such as the paying of kickbacks, 42 U.S.C. § 1320a-7b(b)(2).  These are the crimes with which Defendants are charged, and they are clearly within the scope of relief provided by Section 1345.

Once the United States demonstrates how much Defendants obtained as a result of these "Federal health care offenses," it is entitled to a restraining order freezing all such property or property of equivalent value.  *United States v. DBB, Inc., et al.*, 180 F.3d 1277, 1283 (11th Cir. 1999).  Here, the United States has demonstrated through the Declaration of Special Agent Warren that the companies Defendant Luis controlled, LTC and Professional Home Care, received approximately $45 million from Medicare.  The evidence indicates that virtually all of these payments were for claims that were tainted by kickbacks, not medically necessary or reasonable, not provided at all, and/or were otherwise tainted by fraud.  Section 1345 therefore authorizes the issuance of an order freezing up to $45 million in Defendants' assets.

Defendant Luis's argument that the United States must show how much of the $45 million is traceable to a violation of a *different* statute – 18 U.S.C. § 1347 (health care fraud) – is misplaced.  Defendant Luis has not been charged under that statute, and it has not been alleged in this case.  Thus, *United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007), is not applicable here, as it addressed the sufficiency of the evidence in a conviction under 18 U.S.C. § 1347 and the propriety of the sentence imposed by the district court.[4]

---

[4] Defendant Luis cites two other cases that are also irrelevant on this issue.  The decision in *United States v. Brown*, 988 F.2d 658, 664 (6th Cir. 1993), came several years before Section 1345 was amended in 1996 to allow for broad asset freezes in health care fraud cases.  Thus, the *Brown* court could exercise only the authority that existed prior to 1996, which was to freeze assets identified as the "fruits of the fraud."  *Id.* at 663.  After the 1996 amendment, Section 1345 authorized the restraint of traceable property and property of equivalent value in health care fraud cases.  *See* Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-

Defendant Luis also incorrectly argues that the United States needs to meet a standard higher than probable cause for an injunction to be issued.  The decisions in this district have consistently applied the probable cause standard when determining whether injunctive relief under Section 1345 should issue.  *See United States v. Livdahl*, 356 F. Supp. 2d 1289, 1293-94 (S.D. Fla. 2005); *United States v. Davis*, No. 88-1705, 1988 WL 168562, at *3 (S.D. Fla. Sept. 23, 1988); *see also DBB*, 180 F.3d at 1280 (noting that district court issued injunction upon finding of "reasonable probability").

While some courts elsewhere have found the applicable standard to be preponderance of the evidence, *see United States v. Siriam*, 147 F. Supp. 2d 914, 938 (N.D. Ill. 2001), many others have agreed with the courts in this district that a standard comparable to probable cause is more appropriate in the context of Section 1345.  *See United States v. Fang*, 937 F. Supp. 1186, 1196-97 (D. Md. 1996) ("Given this background, the Court is prepared to conclude that the 'reasonable probability' standard of conventional preliminary injunction analysis equates with 'probable cause' and that it applies in the present [§ 1345] case."); *Savran & Assocs.*, 755 F. Supp. at 1180 (applying probable cause standard); *United States v. Belden*, 714 F. Supp. 42, 45 (N.D.N.Y. 1987) (examining the legislative history and noting "it is unlikely that Congress intended to hold the government to a more stringent standard than that of probable cause when relief under § 1345 was sought").  Defendant Luis provides no support for the suggestion, *see* Corrected Motion at 5, that the United States' burden should be any higher.

---

191, § 247, 110 Stat. 1936, 2018 (1996).  The decision in *United States v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1184 (E.D.N.Y. 1991), involved a mail fraud scheme, not allegations of health care fraud.  Restraints on "property of equivalent value" under Section 1345 are available only in cases involving banking law violations or Federal health care offenses.

## II.       Principles of Fairness Dictate that Defendant Luis Not Be Allowed To Deplete the <u>Small Amount of Frozen Assets to Pay for Criminal Defense Counsel of Her Choice</u>

The United States brought this action to preserve assets for the Medicare Trust Fund, a victim of the large-scale fraudulent scheme perpetrated by the Defendants.  To date, the government has been able to locate and freeze only about $2 million in assets belonging to the Defendants, all of which have been frozen as a result of the Court's TRO.  The Defendants have not accounted for the remaining $43 million, or for whatever other assets they may control that have not been disclosed.  *See, e.g.*, Ex. A.  Nevertheless, Defendant Luis asks the Court to release an unspecified amount of the frozen funds to pay for counsel of her choice in the criminal action.  Her request should be denied, both because of the very substantial amount of the loss in this case, as compared with the small amount frozen, and because of Defendant Luis's failure to come forward with any financial information regarding her assets.

### A.   <u>The Purpose of Section 1345 Militates Against the Release of Frozen Funds</u>

The purpose of Section 1345 is to preserve the status quo by preventing the dissipation of assets until a judgment requiring restitution or forfeiture can be obtained.  *DBB*, 180 F.3d at 1284; *see also CFTC v. American Metals Exchange Corp.*, 991 F.2d 71, 79 (3rd Cir. 1993) (recognizing that a freeze of assets is designed to preserve the status quo and affirming district court's refusal to release funds for attorneys' fees); *SEC v. Infinity Group Co.*, 212 F.3d 180, 197 (3rd Cir. 2000) (same)).  Subsection (a)(2), which allows for restraints on property of equivalent value, was added in 1990 and originally applied only to banking law violations.  *See DBB*, 180 F.3d at 1282-83.  The legislative history indicates that, when originally passed in 1990 after the savings and loan crisis, subsection (a)(2) was intended to strengthen the ability of the federal government to recover funds misappropriated through fraud.  *See id.* (quoting 136 Cong. Rec. H13288, H13296 (Oct. 27, 1990) (Statement of Rep. Schumer) ("We provide for prejudgment

8

attachment and set freezes. You do not want the savings and loan crooks to abscond and escape with their money.  This bill will stop it.")).  As courts have recognized, "Congress wanted to respond to the savings and loan scandal because 'executives of thrift institutions and others associated with them enriched themselves by fraudulently diverting immense amounts of funds from those institutions.'"  *Brown*, 988 F.2d at 662 (quoting 1990 U.S.C.A.A.N. 6472).

Section 1345(a)(2) was subsequently made applicable to health care fraud in 1996.  *See DBB*, 180 F.3d at 1283.  Recognizing that in many health care fraud cases, the fraudulent proceeds are quickly dissipated, leaving little if anything to recover upon conviction, the statute provided the government the ability to freeze property of equivalent value to preserve at least some funds for future restitution to federal health care programs.[5]

In light of this purpose, many courts have refused to release funds for the payment of attorney's fees either in the civil or criminal case.  Just last year, in another action brought in this district under Section 1345, the court refused to release funds for that purpose.  *United States v. American Therapeutic Corp.*, 797 F. Supp. 2d 1289, 1293-94 (S.D. Fla. 2011).  The facts of the *American Therapeutic* case were similar to those here, in that the defendants were alleged to have paid kickbacks and submitted claims for medically unnecessary services, among other fraudulent conduct, in order to receive reimbursements from Medicare.  *Id.* at 1292.  As a result of this conduct, the defendants received approximately $85 million from Medicare, but as of the time of the civil complaint, the government had succeeded in locating assets of the Defendants representing only a small fraction of that amount.  *Id.*

---

[5] There are countless examples in this district alone of cases where the government has been able to recover little, if anything, upon the entry of a money judgment in a health care fraud case.  As just one example, in *United States v. Huarte*, No. 09-20523-CR-SEITZ (S.D. Fla.) (Amended Judgment in a Criminal Case, DE #227), the Court ordered the defendant to pay over $18 million in restitution.  Thus far, the United States has been able to collect only about $10,000.

In moving for the release of certain assets, one of the defendants argued, just as Defendant Luis does here, that the restraint on her "property of equivalent value" prohibited her from exercising her Sixth Amendment right to retain counsel of her choice. *Id.* at 1293. The court rejected that claim, holding that Section 1345(a)(2) expressly allowed for the restraint of property of equivalent value, and that such a restraint did not violate the Sixth Amendment. *Id.* at 1293-94. The court first explained that there is no Sixth Amendment right to counsel in a civil case. *Id.* at 1294 (citations omitted). And in a criminal case, the court continued, the Sixth Amendment "does not grant [criminal] defendants the unqualified right to counsel of their choice." *Id.* (quoting *United States v. Garey*, 540 F.3d 1253, 1263 (11th Cir. 2008)). Thus, the court denied the defendant's motion for the release of funds for attorney's fees.

Courts have also refused to release funds for attorney's fees where defendants have not made a sufficient showing to the court that they have no other source of funds. *See United States v. Speqtrum, Inc.*, No. 10-2111, 2012 WL 517526, at *2 (D.D.C. Feb. 16, 2012). The Court in *Speqtrum* refused to release funds for attorney's fees because the defendant had "submitted no financial records or otherwise demonstrated an inability to pay its counsel." *Id.*

In cases not involving Section 1345 where asset freezes are obtained, courts have denied requests for attorney's fees, recognizing the harm that would be caused to the victims if the funds were released. *See Richards v. Mountain Capital Mgmt, LLC*, No. 10-civ-2790, 2010 WL 2473588, at *2 (S.D.N.Y. June 17, 2010); *SEC v. Utsick*, No. 06-CV-20975-Civ-Huck (S.D. Fla. Aug. 31, 2007); *SEC v. Current Financial Servs.*, 62 F. Supp. 2d 66, 68 (D.D.C. 1999); *SEC v. Grossman*, 887 F. Supp. 649, 661 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 109 (2d Cir. 1996). Courts have refused to release assets particularly in situations where the victim losses are far greater than the amount of the frozen funds. As the court in *Current Financial Services* explained when

10

affirming a freeze that included the defendant's personal funds, "To ensure compensation to the victims in this case, the Court finds it reasonable to maintain the freeze order because plaintiff has demonstrated that the potential disgorgement it could receive in this case far exceeds the amount that is frozen in the account." *Current Financial*, 62 F. Supp. 2d at 68; *see also CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995). In such situations, courts recognize the necessity of preserving funds even if some of them are shown to have a legitimate source. *See Grossman*, 887 F. Supp. at 661 (denying motion to modify asset freeze for attorney's fees, funeral and burial expenses because it was not established that it was in the interest of the victims of the fraud).

## B. A Balancing of the Hardships Here Compels the Continuation of the Freeze

Some courts have released assets for the payment of attorney's fees, exercising their inherent discretion to manage restraining orders. *See United States v. Jamie*, No. 2:10-cv-00498, 2011 WL 145196, at *1 (S.D. W.Va. Jan. 18, 2011). These courts have released assets, however, only after balancing the particular hardships presented by the facts of the case. Thus, in *Jamie*, the court first determined after reviewing the submissions of the parties that the defendant had no other substantial assets from which to pay counsel fees. *Id.* at *2. The fees were for counsel in the civil case, presumably because the defendant would not have counsel otherwise, and the court set the rate at which counsel would be paid out of the frozen funds. *Id.*

In *United States v. Payment Processing Center*, also cited by Defendant Luis, the defendants argued that the government's restraint of $10.1 million under Section 1345 well exceeded the maximum possible damages of $4.5 million (the net profit received by all defendants resulting from the alleged conduct). 439 F. Supp. 2d 435, 439 (E.D. Pa. 2006). This was one of the factors leading the court to release some assets for legal fees for the civil case, as

11

the court noted that in a criminal case, counsel could be appointed.  *Id.* at 440 n.3.   In addition, the court required the defendants to submit complete financial disclosures to show that they could not obtain counsel by any means other than the frozen funds.  *Id.* at 440-41 (citing *CFTC v. American Metals Exch. Corp.*, 991 F.2d 71, 79-80 (3d Cir. 1993)).

The remaining cases cited by Defendant Luis similarly allowed for the release of funds for attorney's fees for the defense of the *civil* proceedings, based on a finding that the defendants would not otherwise be able to defend themselves, and based on the specific circumstances present in those cases.  *See SEC v. Dowdell*, 175 F. Supp. 2d 850, 855-56 (W.D. Va. 2001) (finding that defendants had no other sources of income and, that in the "complex legal matter" before it, the proceedings would not be fair if defendants were not represented at the preliminary injunction hearing); *SEC v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 430 (S.D.N.Y. 2001) (releasing funds for payment of attorney's fees for civil proceeding and noting that "the inference upon which the freeze was granted may not be supported by the necessary quantum of proof").[6]

Here, any balancing of the hardships weighs heavily in favor of maintaining the current TRO.  On the one hand, Defendant Luis is represented by counsel in this civil action under Section 1345 and will have the benefit of that counsel at the preliminary injunction hearing. Thus, there is no question here about releasing funds for attorney's fees so that Defendant Luis can defend herself against this action.  In the criminal case against her, Defendant Luis will be appointed counsel if she demonstrates to the court that she cannot afford to privately retain counsel.

---

[6] The last case cited by Defendant Luis, *SEC v. International Loan Network, Inc.*, 770 F. Supp. 678, 680 (D.D.C. 1991), does not directly address the propriety of releasing funds for attorney's fees but rather mentions in passing that the asset freeze was modified "to permit defendants to retain counsel on their behalf."

On the other hand, the government has submitted substantial evidence that Defendant Luis's fraud scheme deprived the Medicare program of at least $45 million, and it has been able to freeze, through this action, only about $2 million.   Thus, the losses to federal health care programs will be extraordinarily high, and it is simply not equitable to allow Defendant Luis to further deplete what little is left.   Moreover, Defendant Luis has made no showing that she cannot afford counsel other than through the assets the government has frozen.   She has refused to complete financial statements that might disclose the full extent of her assets.[7]   And she has also not explained how the remaining funds from Medicare – over $43 million – were dissipated or transferred.   In fact, it appears that Defendant Luis may be continuing to dissipate assets, as she never disclosed the existence of the safety deposit box that her family member visited after the TRO was in place.   *See* Ex. A; *cf. SEC v. Lauer*, 445 F. Supp. 2d 1362, 1366-67 (S.D. Fla. 2006) (noting that defendant's "unclean hands have closed the door on any attempt by [the defendant] to seek relief from the Court's equitable asset freeze order").

Defendant Luis suggests in her motion that she will provide an "accounting" of her finances upon review of the discovery produced by the government.   *See* Corrected Motion at 14 n.2.   But she clearly does not need any discovery to know her own financial situation or how she spent the $45 million received from Medicare, including the $4.5 million that she withdrew for herself.   Based on this record, fundamental fairness requires that Defendant Luis's currently

---

[7] Because Defendant Luis has invoked the Fifth Amendment in refusing to complete financial disclosures, it is not possible to reach an informed decision regarding Defendant Luis's claimed need to utilize the frozen money to pay legal fees.   Courts look with disfavor at civil litigants who seek to support a claim with some information yet withhold from the other party information relating to the same subject on grounds of privilege.   *See Grossman*, 887 F. Supp. at 660.   Furthermore, an adverse inference may be drawn in civil cases from a party's refusal to answer questions based on the Fifth Amendment.   *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *SEC v. Cherif*, 933 F.2d 403, 416-17 (7th Cir. 1991).   Therefore, it would be proper to infer here that Defendant Luis has knowledge of additional sources of funds unknown to the government.

frozen assets continue to be restrained for future forfeiture or restitution, rather than released for the payment of attorney's fees to counsel of choice.  That is what Section 1345 and the circumstances of this case require.

### III.    The Restraint of Property of Equivalent Value Under Section 1345 Is Entirely Consistent with the Fifth and Sixth Amendments

Defendant Luis argues that property of equivalent value, or untainted assets, must always be available to pay for counsel of choice in a criminal case.  She bases this argument on cases in the criminal forfeiture context, where courts have generally held that the government may restrain pretrial only tainted assets.  The fundamental flaw in her argument, however, is that all of those cases have turned on *the language of the forfeiture statutes at issue*.  Because courts have found that the criminal forfeiture statutes allow for the pretrial restraint of only tainted assets, to allow the government to restrain more would violate the commonsense notion that defendants should be able to use their own assets – not subject to any legal restraint – as they choose, including for the payment of legal fees.

Here, of course, the statute at issue is quite different.  Section 1345(a)(2) specifically allows for the restraint of tainted assets and "property of equivalent value."  The clear meaning of this language has been upheld by the Eleventh Circuit.  *See DBB*, 180 F.3d at 1284.  Thus, there can be no dispute that Section 1345 provides a remedy that the forfeiture statutes do not: the pretrial restraint of untainted assets.  As noted in Section II above, Congress intended this result, as it knew beginning with the savings and loan crisis that certain types of fraud schemes result in massive losses to victims but leave little, if anything, to recover upon conviction.  Thus, Congress purposefully added a prejudgment remedy to buttress the government's enforcement power in responding to certain types of fraud.

14

Because the statute is so clearly against her position, Defendant Luis is left to argue that, as applied to her in this case, Section 1345 violates the Constitution.  But Section 1345 does not, of course, mean that Defendant Luis will go unrepresented in her criminal case.  As she recognizes, she will be appointed counsel in her criminal case if she can demonstrate that she is unable to afford to hire counsel herself.  This is the core guarantee of the Sixth Amendment. "The Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."  *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989).[8]  Thus, while the Sixth Amendment guarantees criminal defendants an absolute right to counsel, the right to counsel of one's choice is not absolute and is, instead, only qualified.  *See United States v. Kaley*, 677 F.3d 1316, 1320 (11th Cir. 2012).  In deciding that there was no exception under the forfeiture statute for the payment of legal fees, the Court in *Caplin & Drysdale* explained, "It is our view that there is a strong governmental interest in obtaining full recovery of *all forfeitable assets*, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged *forfeitable* to pay for their defense."  *Id.* at 631 (emphasis added).

Defendant Luis claims, however, that she has a further right to hire counsel of her choice using untainted assets currently frozen by the TRO.  In doing so, she relies exclusively on cases interpreting the federal criminal forfeiture statutes.  Those cases are not applicable here,

---

[8] Consistent with this understanding, the Supreme Court has upheld other limitations on a defendant's chosen counsel.  *See Wheat v. United States*, 486 U.S. 153, 159 (1988) (upholding the disqualification of the defendant's chosen lawyer because of a conflict of interest); *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (defendant has no right to be represented by lawyer whose schedule cannot be adjusted to the requirements of the court's docket); *Leis v. Flynt*, 439 U.S. 438, 443 (1979) (defendant could not insist on being represented by attorney who was a member of the bar in another state).

however, because every one of them relied on the language of the statute itself to conclude that only tainted assets could be restrained pretrial. *See United States v. Bissell*, 866 F.2d 1343, 1349-50 (11th Cir. 1989) (explaining that under 21 U.S.C. § 853 the government may restrain pretrial assets derived from criminal activity)[9]; *see also, e.g.*, *United States v. Parrett*, 530 F.3d 422, 429 (6th Cir. 2008) (concluding that 21 U.S.C. § 853 did not authorize pretrial restraint of substitute assets); *United States v. Ripinsky*, 20 F.3d 359, 363 (9th Cir. 1994) (same); *United States v. Gotti*, 155 F.3d 144, 149-50 (2d Cir. 1998) (finding that forfeiture provision in 18 U.S.C. § 1963(d)(1)(A) did not authorize pretrial restraint of substitute assets).

The Fourth Circuit is the only circuit to have held otherwise, concluding that 18 U.S.C. 1963(d)(1)(A) does allow for the pretrial restraint of substitute assets. *In re Billman*, 915 F.2d 916, 921 (4th Cir. 1990); *see also United States v. Bromwell*, 222 Fed. Appx. 307, 311 (4th Cir. 2007) (following *Billman*). Significantly, the Fourth Circuit found no Sixth Amendment impediment to this conclusion. This highlights further that the ban elsewhere on the pretrial restraint of substitute assets flows from the terms of the criminal forfeiture statutes themselves, rather than from the Constitution.[10]

---

[9] The more recent *Kaley* decisions from the Eleventh Circuit flowed from *Bissell* and considered whether a defendant was entitled to a hearing pretrial to determine whether the government had seized untainted assets and whether defendants were entitled to their release to retain counsel of choice, *United States v. Kaley*, 579 F.3d 1246, 1259 (11th Cir. 2009), and what the proper scope of such a hearing should be, *United States v. Kaley*, 677 F.3d 1316, 1323 (11th Cir. 2012). Like *Bissell*, the decisions were premised on the limitations of the criminal forfeiture statute, which the court interpreted to allow for the seizure of only tainted assets.

[10] Defendant Luis also cites several SEC enforcement actions in the Southern and Northern Districts of New York that, relying on forfeiture case law, released some untainted assets for the payment of criminal defense fees. *See SEC v. FTC Capital Markets, Inc.*, No. 09-CV-4755, 2010 WL 2652405, at *6-*9 (S.D.N.Y. 2010); *SEC v. Coates*, No. 94-CV-5361, 1994 WL 455558 (S.D.N.Y. 1994); *SEC v. McGinn*, No. 10-CV-457, 2012 WL 1142516 (N.D.N.Y. 2012). The Court need not adopt their approach, as they (1) did not involve Section 1345 and its express authority to freeze property of equivalent value; and (2) as explained above, the forfeiture cases

In this case, Defendant Luis's assets have been properly frozen under Section 1345, up to the amount of the fraud proceeds alleged in the Complaint.  Section 1345 reflects a strong governmental interest in preserving all available assets of a defendant for potential forfeiture or restitution.  And the government, upon conviction, would be entitled to those assets, either as direct proceeds or as substitute assets, both of which were included in the Indictment.  As *Caplin & Drysdale* indicates, the government's interest in all *forfeitable* assets outweighs Defendant Luis's Sixth Amendment interest in hiring counsel of her choice.  While the Sixth Amendment guarantees Defendant Luis adequate representation in the criminal case, it does not go so far as to permit her to access lawfully frozen funds – meant for restitution – so that she may hire counsel of her choice.[11]   To allow defendants, like Defendant Luis, to access lawfully frozen funds on the claim that they are "untainted" would reward them for dissipating funds fraudulently obtained from the government, rather than their own.

## CONCLUSION

For all of these reasons, the United States respectfully requests that the Court deny Defendant Luis's motion for the release of frozen funds for the defense of her criminal case.

---

evolved from the specific restrictions in those statutes.  It is interesting to note, however, that these SEC cases engaged in a specific inquiry into the other available assets of the defendants *and their families* before determining whether the release of assets for legal fees was warranted.

[11] Defendant Luis also asserts a Fifth Amendment right to use substitute assets for the payment of legal fees, but does not explain how any such right is implicated here.  She is entitled to and will receive a preliminary injunction hearing.  No other process is due to her at this stage of the proceedings.

Dated:  November 21, 2012                Respectfully submitted,

                                         WIFREDO A. FERRER
                                         UNITED STATES ATTORNEY

                                    By:  *s/Susan Torres*_____
                                         Susan Torres
                                         Assistant United States Attorney
                                         Florida Bar No. 133590
                                         Susan.Torres@usdoj.gov
                                         99 N.E. 4th Street, Third Floor
                                         Miami, Florida  33132
                                         Telephone: (305) 961-9331
                                         Facsimile: (305) 530-7139
                                         *Counsel for United States of America*


### CERTIFICATE OF SERVICE

I  HEREBY  CERTIFY  that  the  foregoing  document  was  served  this  21st  day  of

November, 2012 via CM/ECF.

                                         *s/Susan Torres*_____
                                         Susan Torres