UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 12-Civ-23588-HUCK |
|     Plaintiff, | : | |
| v. | : | |
| | : | |
| SILA LUIS, et al., | : | |
|     Defendant. | : | |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | : | |

**OMNIBUS REPLY MEMORANDUM IN SUPPORT OF
MOTION TO MODIFY RETRAINING ORDER [DE: 45]
AND UNOPPOSED MOTION TO CONTINUE THE
PRELIMINARY INJUNCTION HEARING [DE: 48]**

Defendant Sila Luis has proposed that the court adopt a construction of 18 U.S.C. § 1345 that limits the reach of the restraining order to an amount "no greater than the actual 'loss' traceable to the health care fraud," DE: 46 at 4, and to "only transactions that conceal or dissipate assets, not ordinary transactions like the payment of attorney's fees." *Id.* at 6. Such a reading is neither unprecedented nor unreasonable, Corrected Motion, DE: 46 at 5-8, and would allow "the court to read a statute that is genuinely susceptible to two constructions ... in a manner that avoids a serious likelihood that the statute will be held unconstitutional." *See United States v. Stone,* 139 F.3d 822, 836 (11th Cir. 1998) (discussing the "doctrine of constitutional doubt").

Thus, defendant Luis is asking the court to modify the restraining order insofar as is necessary to privately fund her legal defense and retain private counsel of her

choice. Defendant has already made a sufficient showing that all of her assets are subject to restraint.[1] The government's Response, DE: 49 at 4, appears to overlook that in the related criminal case before Judge Cooke, defendant submitted a financial disclosure during an interview of her by Pretrial Services, which her attorney supplemented in open court during the pretrial detention hearing. The government cites no case requiring more.[2]

Given what is at stake (e.g., forfeiture of all her assets and felony charges exposing her to years in prison), the complexity of the case (e.g., a labyrinth of Medicare regulations, over a thousand patient files and hundreds of potential witnesses), the projected length of trial (several weeks), and her current status as a pretrial detainee, Ms. Luis understandably wants to deploy her resources to mount an aggressive, no-holds-barred defense, not limited by the constraints imposed by the

---

[1] The government's Response, DE: 49 at 4, claims that the dissipation of assets continues because a family member visited defendant's safe deposit box after entry of the restraining order. Undersigned has disclosed to government counsel that defendant's daughter, an attorney, indeed visited the safe deposit box, but only to remove an item belonging to the daughter/attorney, not to the defendant. Items belonging to the defendant remin in the safe deposit box undisturbed. Accordingly, the daughter/attorney's visit to the safe deposit box did not in any way violate the restraining order or constitute the dissipation of defendant's assets.

[2] Once undersigned is given access to the financial records in discovery, a more detailed analysis of the finances of LTC, Professional and defendant Luis will be presented to the court.

Criminal Justice Act.[3]

In a case of first impression in any of the federal circuits, the government has invoked 18 U.S.C. § 1345 to restrain *all* of the defendant's assets – even those admittedly not tainted by criminal activity – making it a violation of a court order to use her own funds to retain counsel of choice. While the Eleventh Circuit has construed 18 U.S.C. § 1345 to allow the restraint of even "substitute assets," *i.e.*, "property of equivalent value," *United States v. DBB, Inc.*, 180 F.3d 1277 (11th Cir. 1999), it has not upheld such a restraint in the face of a Fifth and Sixth Amendment challenge. Nor has any other.

The Fourth Circuit, the one circuit that authorizes the restraint of substitute assets under 18 U.S.C. 1963(d)(1)(A),[4] has held that "[while] . . .there is no Sixth Amendment right for a defendant to obtain counsel using tainted funds, [the defendant] still possesses a qualified Sixth Amendment right to use wholly legitimate

---

[3] Given the scope of work anticipated, defendant understands that the fees and expenses to have private defense counsel assume responsibility for the criminal case will be in line with *United States v. Kaley,* 579 F.3d 1246 (11th Cir. 2009) ("Together, the two attorneys informed the Kaleys that their legal fees to take the case through trial would be approximately $500,000."); *see also United States v. Bachynsky*, 04-CR-20250-AJ (S.D. Fla.) (DE: 474, 508) (court found a defendant indigent for expenses under the Criminal Justice Act even after "a total of $325,000 for fees and $100,000 for costs [had] been paid to the firm" in a fraud case with a trial expected to last 3-plus weeks).

[4] 18 U.S.C. 1963(d)(1)(A) authorizes the restraint of assets under the RICO statute, as 21 U.S.C. § 853(e) authorizes the restraint of assets under the drug statutes.

funds to hire the attorney of his choice." *United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001), *cert. denied*, 543 U.S. 1022 (2002). The government's Response, DE: 49, does not cite or address *Farmer*. Nor does the government's Response cite or address *United States v. Najjar*, 57 F.Supp.2d 205, 209-210 (D. Md. 1999) ("Defendant's Sixth Amendment right to counsel is simply more important than the Government's interest in the untainted portion of Defendant's substitute property. Accordingly, the court will modify its pre-trial restraining order to the extent that the Government has not established that 4603 Brinkley Road is attributable to assets forfeitable pursuant to § 1963(a).").

Rather, the government cites *In re Billman*, 915 F.2d 916, 921 (4th Cir. 1990), for the proposition that the Fourth Circuit found no Sixth Amendment "impediment" to the restraint of substitute assets. Government response, DE: 49 at 16. But *Billman* did not address a defendant's right to use her *own* substitute assets to retain counsel of choice. Rather, *Billman* dealt with a defendant who proposed to pay her counsel with the substitute assets (fraudulently) transferred to her by her fugitive co-defendant, without consideration. Given that she "did not qualify as a bona fide purchaser for value," the Fourth Circuit rejected her Sixth Amendment claim to use her co-defendant's substitute assets to pay her counsel of choice. *Id.* at 921-22.

The government's Response also does not address defendant's objection to the

-4-

restraint of assets under the Fifth Amendment Due Process Clause insofar as it "is effectively a pretrial limit on the amount of her own money a defendant can spend on her defense." Corrected Motion, DE: 46 at 14. Defendant submits that procedural and substantive due process do not permit the government to restrain untainted assets needed to retain counsel of choice. As Judge Rubin wrote in the context of restraining orders under Title 21, prior to the Supreme Court's decisions in *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) and *United States v. Monsanto*, 491 U.S. 600 (1989):

> The Government seeks a restraining order freezing all of the accused's property, including not only specified assets but also "all monies in [his] possession, custody or control," which presumably includes the contents of his billfold and the change in his pockets... [T]he virtual confiscation of an accused's property-though temporary and accompanied by fair notice and a timely hearing-is so unconscionable as to deprive the accused of substantive due process however it is accomplished procedurally. This is indeed punishment before conviction and before trial.
>
> Even our system of civil justice rests on the adversary process. In a criminal trial that process is paramount. The Government should not be permitted to cripple the defendant at the outset of the struggle by depriving him of the funds he needs to retain counsel and to provide food for himself and his family. Even in the war against crime, due process forbids terrorism. While I welcome the safeguard of judicial discretion, I would set a standard that would guarantee the accused fundamental fairness in the resolution of his dispute with the Government by assuring him minimal funds, reasonable in amount and subject to the court's scrutiny, to employ counsel and to pay essential living expenses until the Government has proved its claim.

*United States v. Thier*, 801 F.2d 1463, 1477 (5th Cir. 1986) (Rubin, J., concurring), *modified on other grounds,* 809 F.2d 249 (5th Cir. 1987). The Supreme Court in *Monsanto* rejected Judge Rubin's categorical view that the restraint of assets needed for counsel of choice would violate substantive due process. *United States v. Monsanto*, 491 U.S. 600, 616 (1989) ("if the Government may, post-trial, forbid the use of forfeited assets to pay an attorney, then surely no constitutional violation occurs when, after probable cause is adequately established, the Government obtains an order barring a defendant from frustrating that end by dissipating his assets prior to trial."). But *Monsanto* only dealt with the restraint of *tainted* assets, not substitute assets.

The government suggests that due process is satisfied by a limited hearing on the question of probable cause. Government's Response, DE: 49 at 4; *see also* Government's Response to Defendant's Motion to Continue, DE: 51 at 3. But none of the cases cited in support of the flimsy probable cause standard implicated the Fifth and Sixth Amendment rights at stake here.

Defendant submits that probable cause is too government-friendly a standard to satisfy due process, if not as to tainted assets, as the defendant maintains, then at least as to substitute assets. After all, 18 U.S.C. § 1345 is a civil injunction statute ancillary to the criminal proceeding. The civil action is seeking interim equitable

-6-

relief pending the outcome of the criminal case that requires proof beyond a reasonable doubt.  *See United States v. Fang*, 937 F. Supp. 1186, 1202 (D. Md. 1996) ("if within a reasonable period of time [after an injunction is entered under section 1345], the Government should fail to go forward with criminal charges, the entire fund may be subject to release from the freeze order."); *id.* at 1197 n. 11 ("A permanent injunction freezing assets not followed by a criminal trial would be virtually impossible to justify and would undoubtedly invite serious constitutional challenge.").

Unlike the typical civil forfeiture case in which the only issue at the ultimate trial is the forfeitability of the assets seized, here the restraint is predicated on the government obtaining a criminal conviction before Judge Cooke.  That conviction can only be obtained on proof beyond a reasonable doubt that the defendant committed the underlying offenses, not on the lower standard governing civil forfeiture cases. Insofar as the assets are needed to retain counsel of choice in the criminal case, a preliminary injunction hearing limited to whether probable cause has been established is insufficient to satisfy due process.  *See generally United States v. Siriam,* 147 F.Supp.2d 914, 937-38 (N.D. Ill. 2001) *(*"to establish a likelihood of success as required by Section 1345, the Government must show by a preponderance of the evidence that a predicate fraud offense has been or is being committed.").

Defendant submits that because forfeiture is predicated on a criminal conviction, which cannot be obtained absent proof beyond a reasonable doubt, the restraint of assets needed for the defense likewise cannot be restrained absent such proof. Otherwise, the government possesses the unilateral power to take from the defendant pretrial – on the lower probable cause standard – the very assets she needs to mount a no-holds barred defense at the ultimate trial that will determine her right to keep those assets, as well as her freedom.

The government's case is built on the words of cooperating witnesses whose credibility has yet to be tested. Each appears to have him/herself committed health care fraud, a fraud each was capable of committing without Ms. Luis' knowing involvement in the crime. Although the government's Response, DE: 49 at 3-4, suggests that it is unable to trace all of the Medicare revenues received by LTC and Professional, the government knows that a substantial portion of the Medicare revenues went to pay the staffing agencies and several hundred nurses, therapists and home health aides to provide home health care services to patients of LTC and Professional. The cooperating witnesses comprise only a handful of the hundreds of contract workers paid by LTC and Professional. Their accusations of kickbacks, unnecessary services and fraudulent billing relate to the patients they were paid to treat – approximately 10% of the roster of patients serviced by LTC and Professional.

It appears that the cooperators falsified information to justify billing LTC and Professional. But even if services were not rendered, defendant Luis is not guilty – and no conviction or forfeiture can be obtained – absent proof (beyond a reasonable doubt) of her knowing participation in the charged conspiracies.[5]

To most effectively rebut the accusations of the eight cooperators will require a thorough presentation of all of the evidence of defendant's innocence, including the records maintained as to each patient, as well as testimony from many of the hundreds of professionals associated with LTC and Professional who were not involved in the criminality of the cooperators. They can testify that LTC and Professional implemented many safeguards to confirm that patients required the home health services for which Medicare was billed. To the extent that the cooperators paid kickbacks to patients or duped defendant into billing Medicare for services not rendered in violation of company policy that defendant Luis strived to enforce, then she is not criminally liable. If defendant can prove to the court that upwards of 90% of the Medicare revenues related to qualified patients who received necessary care without any kickbacks, that will reduce the potential forfeiture and render implausible

---

[5] The material facts are hotly contested so, contrary to the government's suggestion, DE: 51 at 2, an evidentiary hearing is required: "[W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held." *McDonald's Corp. v. Robertson*, 147 F.3d 1301 (1998).

the claims of the handful of cooperators, all of whom are motivated to lie. And to the extent that the government now contends that "this is primarily a kickback case," Government Response to Motion to Continue, DE: 51 at 2, then the amount of potential forfeiture is further diminished, *see United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007) (no losses attributable to kickback scheme)*,* rendering the $45 million restraint overbroad.[6]

                Respectfully submitted,

                **BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
                201 South Biscayne Boulevard, Suite 1300
                Miami, Florida 33131
                Ph. (305) 371-6421 – Fax (305) 358-2006
                E-mail: HSrebnick@RoyBlack.com

By:    /s/   Howard Srebnick
                HOWARD SREBNICK, ESQ.
                Florida Bar No. 919063
                *Counsel for Sila Luis*

---

[6] The government argues that *Medina* is not applicable because defendant Luis has not been charged under 18 U.S.C. § 1347 (health care fraud). DE: 49 at 6. But count 1 of the indictment alleges a violation of 18 U.S.C. § 1349, which makes it a crime to conspire or attempt to commit an offense "under this chapter," *i.e.*, section 1347. Regardless, the teaching of *Medina* is that a kickback, in and of itself, does not equate with a "loss" for sentencing purposes. If no "loss," presumably no restitution and no forfeiture, therefore no need for the restraint.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing was electronically filed via CM/ECF on November 26, 2012.

    /s/   Howard Srebnick
HOWARD SREBNICK, ESQ.